Javier **ALVAREZ**, d/b/a Nueva Castilla Co., a partnership, Plaintiff,

v.

**INSURANCE COMPANY OF NORTH AMERICA, et al., Defendants.**

No. C–86–6120–CAL.

United States District Court, N.D. California.

Aug. 4, 1987.

Socrates Mamakos, San Francisco, Cal., for plaintiff.

Harry J. Levine, Charles J. Philipps, Adams, Philipps & Alexander, San Francisco, Cal., for defendants.

## OPINION AND ORDER

LEGGE, District Judge.

This case involves the issue of whether the Miller Act, 40 U.S.C. § 270a *et seq.*, preempts a state cause of action for unfair insurance practices under the California Insurance Code.[1]

### I.

Plaintiff Nueva Castilla was a subcontractor to Feinstein Construction, the bonded general contractor, on a federal construction project in California. Defendant Insurance Company of North America ("INA"), a Pennsylvania corporation, issued the Miller Act Bond covering the project.

Nueva Castilla sued Feinstein and INA to recover under the Miller Act bond and for bad faith under the California law. *United States ex rel. Nueva Castilla Co. v. Feinstein Construction, et al.,* No. C–85–7125–CAL. This court dismissed the claim for bad faith, primarily on the ground that such relief was not available under the Miller Act. After an arbitration award, judgment on the Miller Act claim was then entered in favor of Nueva Castilla.

In response to the large number of claims against the Feinstein bond, INA filed an interpleader action in this court, *Insurance Company of North America v. Nueva Castilla,* No. C–86–0309–CAL, depositing the amount of its bond. Plaintiff and other subcontractors recovered only the pro rata shares of their claims in the interpleader action.

Plaintiff Nueva Castilla then reasserted its bad faith claim in an action in the Superior Court of California. INA properly removed that action to this court on the basis of diversity jurisdiction. Only this removed bad faith action, No. C–86–6120–CAL, is presently before the court.

The present complaint alleges that defendant INA is subject to the regulations of the California Insurance Code. Plaintiff charges that INA violated Cal. Ins. Code § 790.03 by failing to settle the claim in good faith when liability on the bond was clear. Specifically, plaintiff charges that INA failed to achieve a fair and equitable resolution of plaintiff's claim, failed to properly investigate the claim, falsely denied liability on the bond, asserted meritless defenses, and refused to respond, reasonably, promptly or adequately to plaintiff's inquiries and demands. *See,* Cal. Ins. Code § 790.03.

INA moves for summary judgment on three grounds. First, it argues that this bad faith action is barred by res judicata because of this court's earlier dismissal in C–85–7125–CAL. Next, INA contends that a Miller Act surety is not subject to regulation under the California Insurance Code. And finally, INA argues that plaintiff's cause of action under the state insurance

---

1. The court acknowledges the assistance of Lisa K. Bell and Carl L. Blumenstein in the preparation of this opinion.

regulations is preempted by the Miller Act. Both parties agree that there are no disputed issues of material fact. The court has reviewed the moving and opposing papers, the arguments of counsel, the record and the applicable authorities.

## II.

■ INA contends that plaintiff's bad faith claim is barred by res judicata. The bad faith claim was previously before this court as a part of plaintiff's Miller Act suit in No. C–85–7125–CAL. INA now argues that Nueva Castilla is precluded here by this court's order dismissing that claim.

However, this court's dismissal was primarily on the ground that the state law relief was not available *under the Miller Act. See, United States for the Use of Getz Bros. & Co. v. Markowitz Bros. (Delaware), Inc.,* 383 F.2d 595, 597–98 (9th Cir.1967) (state law may not be used to enlarge remedies of Miller Act) (discussed further *infra*). As no *federal* claim for bad faith could be stated, the court exercised its discretion to dismiss the state claim to the extent that it was also a pendent claim for relief under state law. *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). This court did not resolve the *merits* of plaintiff's state claim.

## III.

The issue in this motion is whether a Miller Act surety can be liable for alleged bad faith in its claims settlement practice, in violation of a state insurance code. This is a question of first impression. To resolve the question, the court must first decide whether California Insurance Code Section 790.03 applies to Miller Act surety companies. That question is decided under California law. If the code section applies

to such surety companies, the court must then decide whether the Miller Act preempts such state regulation of Miller Act sureties. Preemption is a question of federal law.

## IV.

■ Section 790 provides that the purpose of the "Unfair Practices" Article of the Insurance Code is to "regulate trade practices in the business of insurance". It does not explicitly include bonding or surety companies. But section 790.01 lists the insurance businesses to which the article does apply and concludes with the catchall: "as well as all other persons engaged in the business of insurance." Section 790.03 defines prohibited acts and practices "in the business of insurance." Thus, the statutory language of Sections 790.01 and 790.03 refers only to "the business of insurance." On its face, the statute does not apply to surety companies or surety bonds.

No California case discusses whether Miller Act sureties are in "the business of insurance", but a recent case did apply Section 790.03 to surety companies which issue construction bonds. *General Insurance Company of America v. Mammoth Vista Owners Association, Inc.,* 174 Cal. App.3d 810, 220 Cal.Rptr. 291 (1985). To determine whether the surety was engaged in "the business of insurance" as that term is used by Sections 790.01 and 790.03, the *General Insurance* court considered the definition of "insurance" in the Insurance Code. *See,* Cal.Ins.Code §§ 22, 23, 100(5) and 105.[2] The court concluded

[B]y plain and explicit language, the Legislature made suretyship a "class" of insurance subject to regulation under the code. For the purposes of the Insurance Code, one who issues surety bonds is in "the business of insurance" and subject

---

**2.** Cal.Ins.Code § 22 broadly defines "insurance" as "a contract whereby one undertakes to indemnify another against loss, damage, or liability arising from a contingent or unknown event."

More to the point here, Cal. Ins. Code § 100(5) includes "surety" among the "classes" of "[i]nsurance in this state . . ." and Section 105 provides that "Surety insurance includes:

(a) The guaranteeing of behavior of persons and the guaranteeing of performance of contracts (including executing or guaranteeing bonds and undertakings required or permitted in all actions or proceedings or by law allowed), other than insurance policies and other than for payments secured by a mortgage, deed of trust, or other instrument constituting a lien or charge on real estate."

to the provisions prohibiting unfair and deceptive practices.

*Id.* at 824, 220 Cal.Rptr. 291.

This court adopts the reasoning and holding of the *General Insurance* court to the effect that Section 790.03 applies to a surety on a construction bond. There is nothing in the language of the California statute, nor in the reasoning of the *General Insurance* court, to suggest that the same interpretation would not apply to bring a Miller Act surety within the reach of Section 790.03.

The court concludes that, under California law, surety companies which issue Miller Act bonds are subject to the regulations of California Insurance Code § 790.03.

## V.

■ In determining whether the application of that state statute is preempted by the Miller Act, and thus invalid under the Supremacy Clause of the U.S. Constitution, the crucial inquiry is the intent of Congress. *California Federal Savings and Loan Ass'n v. Guerra,* — U.S. —, 107 S.Ct. 683, 689, 93 L.Ed.2d 613 (1987); *Louisiana Public Service Comm'n v. FCC,* 476 U.S. 355, 106 S.Ct. 1890, 1898, 90 L.Ed.2d 369 (1986); *Malone v. White Motor Corp.,* 435 U.S. 497, 504, 98 S.Ct. 1185, 1190, 55 L.Ed.2d 443 (1978).

Preemption may be found in several ways. First, Congress may preempt state laws by stating its desire to do so in express terms. *See, e.g., Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977). The parties here do not dispute that Congress has not stated its express intention to preempt state insurance regulations with the Miller Act. Second, in the absence of express intent to preempt, preemption may still be inferred "where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Con-

gress 'left no room' for supplementary state regulation." *Guerra,* 107 S.Ct. at 689 (*quoting Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)). Third, even if federal regulation has not completely occupied the field, state law will be preempted "to the extent it actually conflicts with federal law." *Guerra,* 107 S.Ct. at 689. As the *Guerra* Court stated, "[s]uch a conflict occurs either because 'compliance with both federal and state regulations is a physical impossibility,' or because the state law stands 'as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.* (citations omitted). The intent to preempt state law is not to be inferred lightly. *Guerra,* 107 S.Ct. at 689; *Maryland v. Louisiana,* 451 U.S. 725, 746, 101 S.Ct. 2114, 2129, 68 L.Ed.2d 576 (1981).

As stated, congressional intent is the critical question in a preemption inquiry. Determining the intent of Congress properly begins with consideration of the actual statutory language. The first section of the Miller Act requires that a contractor on any public work must furnish two performance bonds—one for the protection of the United States and one for the protection of persons supplying labor or material to the project. 40 U.S.C. § 270a. Section 2 of the Act, 40 U.S.C. § 270b, gives "every person who has furnished labor or material in the prosecution of the work provided for in such contract" the right to sue on the bond required by the previous section.[3]

As the Supreme Court has recognized, one purpose of the Miller Act is "to provide security for the payment of all persons who provide labor or material on public work" as an alternative to state mechanics' liens.[4] *Illinois Surety Co. v. John Davis Co.,* 244 U.S. 376, 380, 37 S.Ct. 614, 616, 61 L.Ed. 1206 (1917); *accord, United States for the Benefit of Sherman v. Carter,* 353 U.S.

---

**3.** The remaining sections of the Act, 40 U.S.C. §§ 270c–270e, contain definitions, procedural provisions and exceptions not applicable to the present case.

**4.** Under state law generally, a subcontractor can usually secure a mechanic's lien against state or

private property as security for his labor and materials. As no such lien can attach to federal property, *Rich v. United States ex rel. Industrial Lumber Co., Inc.,* 417 U.S. 116, 122, 94 S.Ct. 2157, 2161, 40 L.Ed.2d 703 (1974), the Miller Act is necessary to provide protection.

210, 216, 77 S.Ct. 793, 796, 1 L.Ed.2d 776 (1957). The sparse legislative history of the Act is in agreement, indicating that Congress' purpose was to protect subcontractors who had previously had difficulty collecting payment on public works. H.R. Rep. No. 1263, 74th Cong., 1st Sess. 1 (1935).[5]

The statutory language and the legislative history are both silent on the subject of regulating the claims practices of the surety companies who provide Miller Act bonds, and thus provide little guidance on the preemption question before this court.

### A.

Neither this court nor the parties have found any controlling authority on the issue raised here;[6] that is, the extent to which the Miller Act preempts state insurance regulations. Defendant's considerable reliance on *F.D. Rich Co., Inc. v. United States for the Use of Industrial Lumber Company Inc.*, 417 U.S. 116, 94 S.Ct. 2157, 40 L.Ed.2d 703 (1974), and *United States for Use of Getz Bros. & Co. v. Markowitz Bros. (Delaware), Inc.*, 383 F.2d 595 (9th Cir.1967) is misplaced. Neither *Rich* nor *Getz* involved an issue of whether the Miller Act preempted the application of state law.

In *Rich*, the Supreme Court reversed a Ninth Circuit decision which had construed the Miller Act to require an award of attorneys' fees in cases where the "public policy" of California would have awarded fees. 417 U.S. at 126, 94 S.Ct. at 2163. The Supreme Court stated that "[t]he Miller Act provides a federal cause of action, and

the scope of the remedy as well as the substance of the rights created thereby is a matter of federal not state law." *Id.* at 127, 94 S.Ct. at 2164. The Court explained its holding as follows:

> Many federal contracts involve construction in more than one State, and often, as here, the parties to Miller Act litigation have little or no contact, other than the contract itself, with the State in which the federal project is located. The reasonable expectations of such potential litigants are better served by a rule of uniform national application.

*Id.* at 127, 94 S.Ct. at 2164.

The *Rich* Court was not faced with the question of whether the Miller Act preempts state claims alleged in a separate suit. Rather, the Court merely held that state law—or, more accurately, the "public policy" of the state—should not be used to expand the *federal* remedy created by the Miller Act.

The language of *Rich* quoted above might be read as implying that another purpose of the Miller Act is to protect parties to Miller Act litigation from inconsistent state obligations by creating a uniform remedy. At most, the reasoning of *Rich* bespeaks a congressional purpose to establish a uniform remedy *under* the Miller Act. Allowing a bad faith suit outside of the Miller Act does not interfere with the desired uniformity of remedy *under* the Act. Nor does a congressional purpose of providing a uniform remedy imply that such a remedy was to be exclusive.

---

5. Since it enacted the statute in 1935, Congress has made several minor amendments to the Miller Act, none of which are pertinent here. *See,* Pub.L. No. 86–135, 73 Stat. 279 (1959) (modifying statute of limitations); Pub.L. No. 89–719, 80 Stat. 1139 (1966) (relating to withholding taxes under Miller bonds); Pub.L. No. 95–585, 92 Stat. 2484 (1978) (raising threshold requirement for bond to $25,000).

6. The court has located only one case which directly addresses the preemptive effect of the Miller Act, and that decision offers little guidance here. In *United Pacific Insurance Co. v. Wyoming Excise Tax Division*, 713 P.2d 217 (Wyo.1986), the Wyoming Supreme Court rejected the argument that the Miller Act preempted a state sales and use tax on Miller Act sure-

ties. The court's holding is not fully analagous to the present case, as the finding of no preemption was buttressed by reliance on a federal statute which preserves state taxation authority. Addressing the preemptive effect of the Miller Act itself, the court observed:

> Nothing in the Miller Act expressly prohibits a state from imposing such independent statutory obligation on the surety.

*Id.* at 227.

Though well reasoned, the *United Pacific* decision is neither controlling authority nor fully dispositive of the issue here, and this court may only give it limited weight.

Similarly, in *Getz,* a subcontractor who had sued the defaulting contractor and the surety under the Miller Act sought to amend its complaint to recover attorneys' fees and a statutory penalty created by a Guam statute *as part of* the Miller Act remedy. 383 F.2d at 596. The district court denied the motion for leave to amend and the Ninth Circuit affirmed on two grounds. First, the Ninth Circuit held that Guam "was without power to enlarge a right conferred by the federal statute upon which appellants based their suits." *Id.* at 597. Also, the Ninth Circuit construed the Guam insurance statute and held that it only applied to insurance companies and not to surety companies. *Id.* at 598–99. Some language of the *Getz* opinion appears to support defendant's position in this case.[7] In spite of those statements, however, *Getz* is distinguishable from the instant case. Plaintiff there sought to enlarge a *federal* remedy in reliance on a local statute which provided for attorneys' fees and a statutory penalty. *See also, United States ex rel. General Electric Supply Co. v. Minority Electric Co.,* 537 F.Supp. 1018 (S.D.Ga.1982) (where pendent state claim was not alleged, court rejected plaintiff's attempt to expand Miller Act remedy by implying local statutory penalty). In this case, Nueva Castilla has brought a *separate* action for unfair insurance practices under *state* statute. In other words, rather than asking this court to expand the federal remedy, plaintiff brings an additional but separate state claim.

### B.

Defendant INA argues that the Miller Act creates a scheme of regulation so comprehensive that Congress left no room for state regulation. INA relies primarily on Treasury Department regulations concerning Miller Act sureties. *See,* 31 C.F.R. § 223. It is appropriate to examine administrative regulations for an indication that Congress intended to occupy a field completely and preempt state law. *California Coastal Comm'n v. Granite Rock Co.,* —— U.S. ——, 107 S.Ct. 1419, 1426, 94 L.Ed.2d 577 (1987); *R.J. Reynolds Tobacco Co. v. Durham County,* —— U.S. ——, 107 S.Ct. 499, 511, 93 L.Ed.2d 449 (1986); *Hillsborough County v. Automated Medical Laboratories, Inc.,* 471 U.S. 707, 718, 105 S.Ct. 2371, 2377, 85 L.Ed.2d 714 (1985). "[B]ecause agencies normally address problems in a detailed manner and can speak through a variety of means, . . . we can expect that they will make their intentions clear if they intend for their regulations to be exclusive." *Hillsborough County,* 471 U.S. at 718, 105 S.Ct. at 2377. Yet, preemption is not to be inferred merely because an agency's regulations are comprehensive. *R.J. Reynolds,* 107 S.Ct. at 512; *Hillsborough County,* 471 U.S. at 717, 105 S.Ct. at 2377.

In this case, defendant INA relies upon various Treasury regulations governing Miller Act sureties. Foremost among those is 31 CFR § 223.18(a), which requires sureties to promptly honor their bonds, and which provides a procedure by which the Secretary of the Treasury will review reports of delinquent sureties, and, if warranted, revoke a surety's certificate of authority.[8] INA also directs the court's at-

---

**7.** In explaining that Miller Act remedies could not be enlarged by the 12 per cent penalty created by the Guamanian statute, the *Getz* court explained:

"The operations of the Government might be obstructed or significantly impaired if, despite clear congressional definition of the right, local authorities were empowered to impose increased liability upon the Government's contractors and those executing surety contracts pursuant to the requirements of federal statutes." 383 F.2d at 597–98.

**8.** 31 C.F.R. § 223.18 states:

§ 223.18 Performance of agency obligations.

(a) Every company shall promptly honor its bonds naming the United States or one of its agencies or instrumentalities as obligee. If an agency's demand upon a company on behalf of the agency or laborers, materialmen, or suppliers (on payment bonds), for payment of a claim against it is not settled to the agency's satisfaction, and the agency's review of the situation thereafter establishes that the default is clear and the company's refusal to pay is not based on adequate grounds, the agency may make a report to the Secretary of the Treasury, including a copy of the subject bond, the basis for the claim against the company, a chronological resume of efforts to obtain payment, a statement of all reasons

tention to regulations which require that Miller Act sureties be certified by the government, 41 C.F.R. § 1–10.202; and that sureties be licensed in the state where the bond is executed, although they need not be licensed in the state where the principal resides, 31 C.F.R. § 223.5.

Those regulations do not demonstrate an intention to occupy the field completely. There is no stated intention to preempt state regulation of sureties. The regulations themselves incorporate state law. *See, e.g.,* 31 C.F.R. § 223.7 (capital of surety companies must be invested in accordance with laws of state where incorporated). And the acts regulated by the Insurance Code are not expressly governed by the regulations. Those regulations deal only generally with the obligation to pay claims, and the only remedy is the loss of the certificate.

INA relies on the fact that it need not be licensed in California. Under the regulations, a Miller Act surety need not be licensed in the state where the bond is to be performed, although it must be licensed in the state where the bond is executed. 31 C.F.R. § 223.5; *Leslie Miller, Inc. v. Arkansas,* 352 U.S. 187, 77 S.Ct. 257, 1 L.Ed.2d 231 (1956) (state may not require licensing of federal contractor). However, that licensing regulation does not reflect any congressional intent to completely regulate Miller Act sureties. If anything, the cited regulation indicates an administrative desire to utilize, rather than preempt, state regulation of sureties.

The operation of the Miller Act and various authorities support the conclusion that the Miller Act does not totally occupy the field. For example, a Miller Act suit on the surety bond is not a subcontractor's exclusive remedy. *See, United States For and on Behalf of Sunworks, etc. v. Insurance Company of North America,* 695 F.2d 455

(10th Cir.1982) (allowing subcontractor to sue bonded general contractor for quantum meruit recovery); *United States ex rel. Mobile Premix Concrete, Inc. v. Santa Fe Engineers, Inc.,* 515 F.Supp. 512 (D.Colo. 1981) (holding that subcontractor could recover damages from general contractor for delay in performance under state law). Federal courts have also found it necessary to rely on state law to fill in the interstices of the Act. *United States for the Use of Building Rentals Corp. v. Western Casualty and Surety Co.,* 498 F.2d 335, 338 n. 4 (9th Cir.1974); *American Surety Co. v. United States For the Use and Benefit of B & B Drilling Co.,* 368 F.2d 475, 478 (9th Cir.1966).

Neither the alleged comprehensiveness of the regulatory scheme, nor the regulations, evidence a congressional intent to occupy the area regulated by the California statute.

### C.

INA also contends that the state insurance regulations here are preempted because they "actually conflict" with the Miller Act and accompanying regulations. As stated above, such a conflict can be found where compliance with both federal and state regulations is a physical impossibility, or where the state regulations stand as as an obstacle to the federal purpose. *Guerra,* 107 S.Ct. at 689.

In this context, the Ninth Circuit has admonished:

> In applying preemption analysis, we "distinguish those situations in which the concurrent exercise of a power by the Federal Government and the States ... *may possibly* lead to conflicts and those situations where conflicts *will necessarily* arise." ... There is no necessary conflict between [the state law under consideration] and federal law, and it will

offered for nonpayment, and a statement of the agency's views on the matter.

(b) On receipt of such report from the Federal agency the Secretary will, if the circumstances warrant, notify the company concerned that the agency report may demonstrate that the company is not keeping and performing its contracts and that, in the ab-

sence of satisfactory explanation, the company's default may preclude the renewal of the company's certificate of authority, or warrant prompt revocation of the existing certificate. This notice will provide opportunity to the company to demonstrate its qualification for a continuance of the certificate of authority.

be time to consider any future conflicts if and when they arise.

*Chevron U.S.A., Inc. v. Hammond,* 726 F.2d 483, 501 (9th Cir.1984), *cert. denied,* 471 U.S. 1140, 105 S.Ct. 2686, 86 L.Ed.2d 703 (1985) (citations omitted; brackets and underlining in original).

### 1.

In this case, compliance with both state and federal regulation is possible. The Miller Act requires general contractors to obtain a performance bond in favor of subcontractors and grants those subcontractors a right to sue the surety company directly under the bond. 40 U.S.C. §§ 270a, 270b. The Treasury Department's regulations require surety companies to be certified, to promptly resolve claims, to be licensed in the state where the bond is executed, and to be subject to Department review if unfavorable reports are received. *See,* 31 C.F.R. §§ 223.5, 223.18.

Section 790.03 of the California Insurance Code prohibits numerous unfair insurance practices, including the failure to acknowledge and act promptly on claims, the failure to adopt standards for prompt investigation and processing of claims, the failure to affirm or deny coverage within a reasonable time and the failure to settle promptly and in good faith when liability is reasonably clear.[9]

A surety company in INA's position would be able to meet the requirements for federal certification, and also be able to conduct business so as to comply with both federal and state requirements of promptness and good faith. *See, e.g., Guerra,* 107 S.Ct. at 695 (finding no actual conflict because state statute did not require any conduct that was prohibited by federal statute); *Chevron,* 726 F.2d at 499 (examining state law and federal regulations as they "are applied concurrently" and finding no actual conflict). The California statute does not require INA to engage in any conduct that is prohibited by, or inconsistent with, the federal statute.

### 2.

Even in the absence of actual conflict, state regulation may be preempted if it presents an obstacle to the accomplishment of a federal purpose. *Guerra,* 107 S.Ct. at 689. As explained above, the central legislative purpose of the Miller Act is to protect subcontractors and others who provide materials and labor on federal projects. On at least one level, Section 790.03 is consistent with this objective, as the purpose of the California statute is to protect claimants against unfair insurance practices. *See, Chevron,* 726 F.2d at 496 (finding legislative objectives of state and federal pollution regulations to be consistent). In the context of the present case, the federal remedy protects a subcontractor in plaintiff's position against a general contractor's default by allowing a suit against the surety. The federal regulations provide additional protection against sureties who fail to promptly honor their bonds. The California statute further ensures the effectiveness of the federal remedy by requiring that the surety promptly resolve claims in good faith.

Defendant INA argues that applying the California statute will obstruct the federal purpose by deterring surety companies from providing bonds for federal projects in California. That result, it is argued, would interfere with Congress' objectives

---

**9.** Among other provisions, Section 790.03 states: The following are hereby defined as unfair methods of competition and unfair and deceptive acts or practices of insurance.

. . . . .

(h) Knowingly committing or performing with such frequency as to indicate a general business practice any of the following unfair claims settlement practices:

(2) Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies.

(3) Failing to adopt and implement reasonable standards for the prompt investigation and processing of claims arising under insurance policies.

(4) Failing to affirm or deny coverage of claims within a reasonable time after proof of loss requirements have been completed and submitted by the insured.

(5) Not attempting in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability had become reasonably clear.

. . . . .

of protecting subcontractors on federal projects, as well as hamper the federal government's construction efforts.

Conceivably, a state's insurance regulation might be so harsh that it could effectively prohibit a surety from issuing Miller Act bonds and, perhaps, interfere with the government's ability to contract for public works. Such effects could present an obstacle to the federal purpose. Preemption would likely be found in such a case where state "regulation" had become a "prohibition" sufficient to interfere with the federal purpose. In this case, California's regulations do not approach such a "prohibition" against Miller Act sureties. *See. e.g. California Coastal Comm'n*, 107 S.Ct. at 1428–29 (finding no preemption as state regulation did not amount to prohibition of federally permitted activity). The California regulations, broadly viewed, codify insurance claims procedures which are consistent with good claims handling generally. Further, INA's argument is "too speculative to support preemption." *See, Hillsborough County*, 471 U.S. at 720, 105 S.Ct. at 2379 (rejecting argument that county regulation of plasma donors would raise cost of plasma and thus interfere with federal interest in assuring adequate plasma supply); *accord, Chevron*, 726 F.2d at 501 (possible, future conflicts insufficient for finding of preemption).

Defendant INA has not shown that either the objectives of the California statute, or the application of that statute to INA, would conflict with the Miller Act and the accompanying regulations. Nor does it appear that enforcement of the California statute would interfere with congressional objectives.

## VI.

The court concludes that (1) plaintiff's action is not barred by this court's prior order; (2) Section 790.03 of the California Insurance Code does regulate defendant INA, a surety which issued a Miller Act bond to be performed in California; and (3) the Miller Act does not preempt that state regulation of unfair insurance practices.

For the foregoing reasons, defendant's motion for summary judgment is denied.

A status conference will be held on September 4, 1987, at 11:00 a.m. to set the further schedule for the discovery and trial of this case.

IT IS SO ORDERED.